ROBERT R. POWELL, SBN: 159747
**POWELL & ASSOCIATES**
925 West Hedding Street
San Jose, California 95126
T: 408-553-0201 F: 408-553-0203
E: rpowell@rrpassociates.com

RYAN A. GRAHAM, SBN: 310186
**LAW OFFICES OF RYAN A. GRAHAM, ESQ.**
1049 Havenhurst Dr., No. 510
West Hollywood, CA 90046-6002
T: (323) 792-6377  F: (323) 345-5035
E: ryan@ryan.law

Attorneys for Plaintiff Jeremy Westfall

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY WESTFALL,<br><br>                          Plaintiff,<br><br>        vs.<br><br>COUNTY OF STANISLAUS, OPHELIA NGUYEN, ERICA POWELL, CHRISTINE HUBER, PATRICIA TOUT, CLAUDIA LLAMAS, ELIZABETH ANSHUTZ, JORGE CONTRERAS and DOES 1-10 inclusive,<br><br>                          Defendants. | Case No.:<br><br>COMPLAINT FOR VIOLATION OF CIVIL RIGHTS [42 U.S.C. § 1983]<br><br>DEMAND FOR JURY TRIAL |

1

# I.

## JURISDICTION AND VENUE

1.    **JURISDICTION**.  PLAINTIFF brings this lawsuit pursuant to 42 U.S.C. § 1983 to redress the deprivation by defendants, at all times acting under color of state law, of rights secured to PLAINTIFF under the United States Constitution, including the Fourteenth Amendment.

2.    Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1343(3) and 1343(4), which provides for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is also conferred by 28 U.S.C. § 1331(a) because claims for relief derive from the United States Constitution and the laws of the United States.

3.    Venue properly lies in the Eastern District of California, in that the events and circumstances herein alleged occurred in the County of Stanislaus, and at least one defendant resides in the County of Stanislaus.

# II.

## PARTIES

**PLAINTIFF**

4.    PLAINTIFF JEREMY WESTFALL (hereafter "Jeremy") at all times relevant herein, was a resident of the County of Stanislaus. As of January 1st of 2019, JEREMY had three children, Kelsey Westfall, at the time age 10, B.W., at the time age 5, and G.W. at the time age 7.

5.    The children's full names are known to Defendants and is being withheld herein, unless otherwise ordered by the court, to provide them confidentiality.  Kelsey is deceased, and her name will not be redacted.  Plaintiff reserves the right to request this Court not require

the redaction of any of the children's names, believing that the fact of what goes on in the closed doors of the juvenile dependency Court in Stanislaus County is a grotesque outrage and a factor in creating the repeated abuse of power by Stanislaus County social workers.

6.     Prior to the removal of the children from Jeremy on February 27th, 2019 of his son B.W., Jeremy was enjoying his relationship with Taylor Webb since approximately April of 2014 and the family unit they had built and nurtured.  They had become a "couple" and an integrated and blended family for near five years prior to the fateful day of February 27th, 2019, when Stanislaus County social workers ripped the family apart

7.     Jeremy, Taylor, Jeremy's oldest child Kelsey, and B.W. lived together and shared all the intimacy of a close-knit family providing mutual emotional support and love to each other on a daily basis.  B.W.'s affection for Taylor was evident in the fact he referred to Taylor as his "mother."

8.     Taylor also assisted and supported Jeremy and the children in every way possible, including assisting Jeremy in caring for Kelsey.  Kelsey is a child who at age four, had developed a severe, always fatal condition related to a congenital defect known as Mucopolysaccharidosis type III, also known as Sanfillipo syndrome. Used by its acronym herein, MPS3 is symptomatically similar to cerebral palsy.  It is a progressive disease that primarily affects the brain and spinal cord. It normally resulted in an early death when a person was in their teenage years but was known to cause death as early as ages 10 through 13; Kelsey was 10 at the time of her death.

9.     Due to her illness, Kelsey was non-verbal, wheelchair bound, had a gastronomy-tube for feeding, and required around the clock care.  She had resided with paternal grandmother for five or six years until the grandmother passed away in March of 2018. Thereafter, she

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

resided with Jeremy and Taylor who provided care for her until she passed away February 27, 2019.

10.     Jeremy knew his daughter was not long for the world but had made the decision long before COUNTY became involved, that he was going to take care of his daughter for whatever time she had left, rather than put her in some facility.

11.     Kelsey's affliction meant that she could not bathe, feed, cloth, or groom herself, but between Jeremy, Taylor, and an In-Home-Support-Services ("IHSS") aid who lived next door to the family (Mr. James Owsley), Kelsey was kept clean, safe and happy in her father's care, just as she had been in Jeremy's mother's care.

12.     G.W. was a child with significant autism who was in the custodial care of a paternal aunt and uncle, but who freely visited with his father Jeremy.  Jeremy's time for such visits, for pretty much anything leisure or recreational really, was limited by the fact he lived in Modesto but for the prior three and a half years or so his work as a union mason took him to the San Francisco Bay Area typically five (5) days a week, thus involving commutes both ways ranging from ninety (90) minutes to two and one-half hours.

13.     In addition, Jeremy would on occasion during the work week either have to stay in the San Francisco Bay Area or the surrounding areas all week long in employee housing of some form or another due to the size and scope of the masonry project contracted by his employer.  But for the most part Jeremy would get up and leave early in the morning and make the round trip to the Bay Area so he could be with his children and Taylor in the evening.

14.      Together, Taylor and Jeremy, despite these somewhat arduous and challenging circumstances, were happy, healthy, enamored with the children, grateful for a large extended family support system on Jeremy's side of the family, and simply very much in love.

**OTHER INVOLVED PERSONS AND TERMS IN THIS COMPLAINT**

15.      Other persons relevant to the facts to be discussed herein may include Frank Westfall, Jeremy's father, Melynda Westfall, Jeremy's step-mother, and Klorissa Dawson, biological mother of Kelsey, B.W., and G.W.

16.      Ms. Dawson had struggled with addiction for years during her relationship with Jeremy, which led to altercations with Jeremy, however, they were entirely altercations related to Jeremy attempting to stop Klorissa from hurting herself, hurting him, leaving in a car while under the influence, etc.

17.      A term used herein is "Safety Plan."  The actual form that COUNTY/CSA uses is titled an "Action Plan," but the social workers of CSA themselves most commonly refer to the process as "developing a safety plan," and the final written product on a form titled "Action Plan," still as a "Safety Plan."

18.      The Safety Plan is most frequently a handwritten document intended to memorialize alleged agreed upon steps/tasks for the various participants – including the parent(s) – to take, what concerns justified the steps/tasks the various participants are to undertake, and spells out the "resolution" reached between the parties, whatever resolution that may be (continued detention of the child, removal of a child, return of a child, placement of a child with a relative or extended family member). However, Safety Plans are also entered into orally on occasion, as the circumstances of the event causing COUNTY to be in the family's life may not allow for the preparation of a written Safety Plan.

19.      However, as is frequently the case by practice and custom in Stanislaus County, parent(s) are not free to object to the Safety Plan, and "consent" is coerced by the threat of removing the child/children and placing them in foster care if the parent does not consent to the Safety Plan and the provisions the social workers insist be included in it. The Safety Plan does not involve a court and is not a legally enforceable document or agreement of any kind, particularly, as occurred in this case, the entering into of the agreement by the parent is the result of coercion and the existential threat of having one's child taken from them.

20.      The term "CWS/CMS" used herein, refers to the Child Welfare Services / Case Management System, which is a statewide database in California for all investigations and open cases involving children and/or parents in the juvenile dependency system.

21.      The term "DSL" and any plural form thereof herein is a reference to "Delivered Service Logs," which are chronological notes social workers are supposed to keep pursuant to State regulations and social work best practices, of the contacts and communications they engage in during the course of an investigation or handling of matters pertaining to children/families, in "the system."  Such notetaking in the DSL's would be required when a child/family is in either "case" open only in terms of internal files in a child welfare agency, but also any matters involving children/families that have led to the filing of a juvenile dependency petition regarding a child in that family.

22.      The term "MPD" as used herein is in reference to the Modesto Police Department.

**DEFENDANT COUNTY AND SOCIAL WORKERS**

23.      Defendant County of Stanislaus ("COUNTY") is a municipality in corporate form, organized and existing under the laws of the State of California, and has as an administrative subunit thereof the Community Services Agency ("CSA") which has as an administrative

subunit thereof, Child & Family Services ( "CFS"), all three of which, and any unknown administrative or executive subunits thereof, are collectively referred to herein as COUNTY.

24.     Defendant OPHELIA NGUYEN ("NGUYEN"), whose acts as alleged herein were performed under color of state law was at all times material hereto, a social worker employed by COUNTY, and a Defendant physically participating in the removal decision of taking B.W. from his father Jeremy on February 27th, 2019.

25.     Defendant ERICA POWELL ("POWELL"), whose acts as alleged herein were performed under color of state law was at all times material hereto, a public health nurse employed by COUNTY, and a Defendant physically participating in the removal decision of taking B.W. from his father Jeremy on February 27th, 2019.

26.     Defendant CHRISTINE HUBER ("HUBER"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, an Assistant Director with the COUNTY's CFS, with supervisory authority over NGUYEN, POWELL, LLAMAS, ANSHUTZ, CONTRERAS, and TOUT, employed by COUNTY and a Defendant participating in the removal decision to remove, and/or directing the removal of B.W. from his father Jeremy on February 27th, 2019.

27.     Defendant PATRICIA TOUT ("TOUT"), whose acts as alleged herein were performed under color of state law, was at all times material hereto a social worker supervisor with supervisory authority over NGUYEN, and a Defendant participating in the removal decision to remove, and/or directing the removal of B.W. from his father Jeremy on February 27th, 2019.

28.     Defendant CLAUDIA LLAMAS ("LLAMAS"), whose acts as alleged herein were performed under color of state law, was at all times material hereto a social worker supervisor

employed by COUNTY, and a Defendant participating in the removal decision and/or directing the removal of B.W. from his father Jeremy on February 27th, 2019. Defendant may also use name "LLAMAS-CABALLERO."

29.     Defendant ELIZABETH ANSHUTZ ("ANSHUTZ"), whose acts as alleged herein were performed under color of state law, was at all times material hereto a social work supervisor employed by COUNTY, and a Defendant participating in the removal decision and/or directing the removal of B.W. from his father Jeremy on February 27th, 2019. Defendant ANSHUTZ was also the social work supervisor of MADDOX, and participated personally in preparing an Addendum Report submitted to the juvenile Court April 23rd, 2019 for an April 25th, 2019 Jurisdiction trial, or reviewing and approving same, which Addendum Report was submitted with the intended effect of maintaining custody of B.W. on behalf of the agency and causing the Court to declare Court jurisdiction over B.W.

30.     Defendant JORGE CONTRERAS ("CONTRERAS"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFF's information and belief a social work supervisor employed by COUNTY, and a Defendant participating in the removal decision and/or directing the removal of B.W. from his father Jeremy on February 27th, 2019.  CONTRERAS was also a participant in the decision to obtain a protective custody warrant for Kelsey and B.W. on February 8th, 2019, pursuant to the "take one, take all" policy, practice and custom of COUNTY.

31.     ERIC ANDERSON ("ANDERSON"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFF's information and belief a social worker supervisor employed by COUNTY, and a participant in the decision to

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

obtain a protective custody warrant for Kelsey and B.W. on February 8th, 2019, pursuant to the "take one, take all" policy, practice and custom of COUNTY.

32.      Defendant MARINA WILBUR ("WILBUR"), whose acts as alleged herein were performed under color of state law, was at all times material hereto a social worker employed by COUNTY, and a Defendant participating in or personally preparing a W&IC 300 Petition and Detention Report submitted with the intended effect of maintaining custody of B.W. on behalf of the agency through the Detention Hearing of March 4th, 2019, and a Jurisdiction Report for a Jurisdiction trial on 3/25/19 intended to cause the Court to declare Court jurisdiction over B.W.

33.      Defendant NINA DHANOTA ("DHANOTA") whose acts as alleged herein were performed under color of state law, was at all times material hereto a social worker supervisor employed by COUNTY, and a Defendant participating in the preparation and/or supervision or approval of a W&IC 300 Petition and Detention Report submitted by WILBUR to the juvenile dependency court with the intended effect of maintaining custody of B.W. on behalf of the agency through the Detention Hearing of March 4th, 2019, and also a Jurisdiction Report submitted by WILBUR for a hearing on 3/25/19 intended to cause the Court to declare Court jurisdiction over B.W.

34.      Defendant MELISSA MADDOX ("MADDOX"), whose acts as alleged herein were performed under color of state law, was at all times material hereto a social worker employed by COUNTY, and a Defendant participating in or personally preparing an Addendum Report submitted to the juvenile Court April 23rd, 2019, for the April 25th, 2019 Jurisdiction hearing, again, submitted with the intended effect of maintaining custody of B.W. on behalf of the agency and causing the Court to declare Court jurisdiction over B.W.

35.     Defendant JEREMY PANNELL ("PANNELL"), whose acts as alleged herein were performed under color of state law, was at all times material hereto a social work supervisor employed by COUNTY, and a Defendant participating in the preparation or supervising and approving the preparation of a W&IC 300 Petition regarding B.W., which sworn document PANNELL signed in addition to WILBUR, and which was submitted with the intended effect of maintaining custody of B.W. on behalf of the agency and causing the Court to declare Court jurisdiction over B.W.

36.     Defendant TERESA MADRIGAL ("MADRIGAL"), whose acts as alleged herein were performed under color of state law, was at all times material hereto a social worker employed by COUNTY, and a Defendant participating in or personally preparing reports to the juvenile dependency Court after the Court had found jurisdiction over B.W. in April of 2019. MADRIGAL was the point of contact for service provider Judie Schardijin, and engaged in the conduct complained of and discussed herein below with regard to that contact.

37.     PLAINTIFF is informed and believes and, based upon such information and belief, allege that, at all times herein mentioned, each and every defendant-employee of the COUNTY was the agent and/or employee of their co-defendant COUNTY employees named herein above, and was acting either in their individual capacity or in the scope, purpose and authority of COUNTY, and/or in their employment or agency with said entities, and with the knowledge, permission, ratification, and/or consent of said co-defendants and/or entities.

38.     PLAINTIFF is informed and believes, and thereon allege, that each of the named individual defendants hereinabove, did knowingly and willingly, with a common intent and scheme set forth in further detail herein below, conspire with the other named Defendants to plan and execute the unlawful removal of B.W. from PLAINTIFF on February 27th, 2019,

removing B.W. from his father's care, custody, and control that day in an effort to injure

PLAINTIFF, and deprive PLAINTIFF of his rights, liberties, and interests, as such rights are

afforded under the United States Constitution and the California State Constitution, and

conspired generally to damage PLAINTIFF and inflict great injury upon him; which they did.

**COUNTY OF STANISLAUS – MONELL POLICIES & PRACTICES & TRAINING**

39.    COUNTY has in its employment various social workers and supervisors, such as the

named individual Defendants herein above, who by virtue of their employment are state

actors within the meaning of that term in the context of civil rights legislation embodied in 42

U.S.C. 1983.

40.    COUNTY promulgated, encouraged, and/or permitted, the policies, patterns, and

practices described below under and as the moving force of which the individual defendants,

and DOES 1 – 10, committed the acts or omissions complained of herein, and COUNTY

condoned, ratified, and encouraged the conduct of the COUNTY employee-defendants as

complained of herein, and also failed to train or inadequately trained the COUNTY

employees and the herein named COUNTY employee-defendants in a manner exhibiting

deliberate indifference to causing recurring violation of parent(s) and children(s)

constitutional rights of familial association.

41.    As the employer of social workers, social work supervisors, and the assistant director

named herein above, COUNTY had primary responsibility for the training, education, and

supervision of its employees, and PLAINTIFF is informed and believes and thereon alleges

that it was COUNTY which promulgated, encouraged, administered, and/or permitted, the

policies, practices, customs, and procedures under which, and as the moving force of which,

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

the individual defendant employees of COUNTY committed the acts or omissions and constitutional violations complained of herein.

42.     As specified in the Sixth Claim for Relief below, PLAINTIFF contends and alleges the COUNTY is vicariously liable for each of the actions complained of in each of the Claims for Relief below wherein the individually named COUNTY employee Defendants are alleged to have violated federal laws and/or constitutional rights of Plaintiff; such liability inuring to COUNTY by virtue of the law set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny, and by virtue of the fact that the violations complained of herein occurred because of COUNTY policies, practices or customs, and possibly as well the non-existent or inadequate training provided to COUNTY social workers and supervisors, such that these affirmative actions and/or omissions to take appropriate actions were the moving force behind the violations of the PLAINTIFF Jeremy Westfall's constitutional rights.

43.     PLAINTIFF alleges that the COUNTY has policies, practices, and/or customs which contain the following features in their modus operandi, features that are constitutionally violative of parents and children's rights on their face and yet perpetuated and pursued with deliberate indifference to the rights and safety of PLAINTIFF herein, and families such as PLAINTIFF's family within Stanislaus County.

44.     Such policies, practices, and customs include but are not limited to those that follow;

A)  A policy, practice, or custom authorizing and or ratifying without discipline, threat of discipline, or reprimand of social workers and/or their supervisors, the repeated removal of children from their parents or guardians without a warrant, consent, or imminent risk of serious bodily injury to [a] child[ren], taking [a] child[ren] when there is sufficient time to obtain a warrant and there are less intrusive means of protecting the child[ren] from whatever

the social workers perceived imminent risk of serious bodily injury to the child[ren] might be, and for which the result of said policy has been thousands of lawless removals of child[ren] from parents and/or the separation of children from parents in Stanislaus County over the past several years violating both the parents and child[ren]'s constitutional rights of procedural and substantive due process under the U.S. Constitution and the amendments thereto.

This policy, practice, or custom, has been the moving force behind the removals in the following families known to Plaintiff, all within the past three (3) years unless otherwise noted, 1) warrantless removal of children from Angelina Nunes and Emanuel Alves (July 2016), 2) warrantless removal of children from Leah & Serena Ford, 3) warrantless removal of child (other than B.W.) from Jeremy Westfall and Taylor Webb, 4) warrantless removal of child from Leann Santor, 5) warrantless removal of child from Shane Beard, 6) warrantless removal of children from Hilda Perez, 7) warrantless removal of children from Emannuel and Makeda Wyatt.

B) the COUNTY has a policy and/or unwritten practice or custom of threatening parents/guardians to enter into what COUNTY calls "Safety Plans," wherein in the parent(s) are threatened their child/children will be removed and placed in foster care if they will not agree to terms the COUNTY social worker(s) demand, which can include but are not limited to such onerous and constitutionally violative conditions / terms as,

i) separating the parent(s) from their child[ren] by placing them with someone else,

ii) separating from their spouse or significant other,

iii) dictating a parent shall have no contact whatsoever with the child[ren]'s other parent, a family relative, any COUNTY CSA or CFS employee declared "suspected" perpetrator of abuse/neglect as to the child[ren],

iii) filing in the Superior Court unsworn and sworn documents containing false and misleading claims against the other parent, or others, with state juvenile dependency courts in order to comply with COUNTY demands effecting violations of rights of familial association, one or all of which terms and conditions the parent(s) are told by COUNTY through its social workers if not agreed to, will result in the removal of the parent(s) child[ren] from their care, custody, and control, and the child[ren] are in fact removed unlawfully repeatedly by COUNTY when they refuse to "cooperate" and/or enthusiastically agree with anything CSA social workers want or demand of the parents.

This policy, practice, or custom regarding "Safety Plans," has been the moving force behind the removals in the following families known to Plaintiff, all within the past three (3) years unless otherwise noted, 1) warrantless removal of children from Angelina Nunes and Emanuel Alves (July 2016), 2) warrantless removal of children from Leah & Serena Ford, and 3) warrantless removal of child (other than B.W.) from Jeremy Westfall and Taylor Webb.

C) the COUNTY has a policy and/or unwritten practice or custom of removing all children from parents whenever they remove a single child ("take one, take all") or force a "Safety Plan" upon the family, and specifically practice or have a custom of "take one, take all" when there has been the death of a child in the home, without obtaining a warrant.

The removal of other children as a result of the death of another child in the household happened proximate in time to the removal of B.W. in that on May 9th, 2018, COUNTY came and removed a minor child of Leann Santor of Stanislaus County, after her other child had died of an undiagnosed – and therefore "SIDS" diagnosis – and that cause had actually been told to the removing social workers by medical professionals before the social workers

continued on and removed Ms. Santor's remaining child in the possession of her grandmother at the time, doing so without a warrant and in an absence of reasonable cause to believe the child was at imminent risk of serious bodily injury within the time it would take to obtain a warrant, and without having considered or explored lesser intrusive means; the child was actually in the care of a grandparent.

In the removal of multiple children where the "take one, take all" policy, practice, or custom was the moving force behind the warrantless removal of siblings with no allegations of abuse or neglect made regarding them, there has been within the past (3) years, unless otherwise noted, the following family's victimized by the policy, practice, or custom,

D)  PLAINTIFFS allege the COUNTY has no training and/or at best constitutionally inadequate training with regard to all of the following areas of law and issues that arise routinely in the context of any child abuse and/or neglect investigation on a daily basis in the County of Stanislaus, as follows;

1) the scope, nature, and importance of the 4th and 14th Amendment based rights protecting familial association, including but not limited to,

i) the procedural due process right to have notice and the opportunity to be heard by a neutral and detached judicial officer before the removal of a child from a parent's care in the absence of narrowly circumscribed exceptions to that requirement based on circumstances constituting learned in the investigation of abuse/neglect of an imminent risk of serious bodily injury, and,

ii) the constitutional rights and liberty interests of a parent to care for his/her child without unreasonable government interference, and the reciprocal rights of a child to same, and,

iii) the existence and relevance of federal laws and precedent on the removal of children from their parents / guardians in the context of an investigation of a child abuse or neglect referral, and,

iv) the prohibition under federal law for including false statements, misrepresentations of evidence, and omitting exculpatory information that may be clarifying or mitigating to one or more allegations or statements of fact submitted to the Court for purposes of furthering removal and/or continued detention of children, and continued juvenile court proceedings, within a document filed with the Superior Court, some of which are filed under penalty of perjury.

2) the nature and extent of the physical, emotional, and psychological harm that removal of children causes parents and the children, including but not limited to,

i) the permanent and untreatable emotional and physiological damage to children and life-long sequalae of emotional and psychological instability of children separated from their parent(s), and,

ii) the nature of the aforementioned damage as being physically measurable in regards to physical changes in children's developing brains as seen in the impairment of neurons and neurological receptor conductivity in the brain, and diminished growth of both grey and white matter in their brain,

iii) the importance of the parent-child bond that is disrupted by removal and/or separation from parent(s), to the long term behavioral, emotional, and psychological function of [a/the] child[ren] passing through infancy, youth, adolescence and adult hood, and inclusive but not limited to the effect of the

16

child[ren]'s ability to form lasting emotional bonds with friends, family, lovers and spouses, in addition to the panoply of individuals encountered in a lifetime such as teachers, and coaches, pastors, and mentors, for whom children damaged in the way complained of above, cannot learn and grow and achieve their highest and best human achievement because they cannot achieve any semblance of an intimate emotional bond with those individuals, and,

iv)  the depths of depression, despair, anxiety, anger, and grief visited upon parents of child[ren] removed by COUNTY and the long-term effects of that experience on their ability to function emotionally and psychologically, to trust government authority, and to feel safe and secure in their homes and families.

### III

### COMMON FACTS

**2018 REFERRALS HIDDEN**

45.     The first referrals received by CFS that were in any way related to claims pertaining to Kelsey's care in the custody of Jeremy, actually started in September of 2018, and PLAINTIFF is informed and believes there were two in September 2018.

46.     Both were regarding Kelsey, the first was made by the Sonoma Elementary School nurse, alleging "physical abuse" due to the child allegedly arriving at school one day in a "soaked diaper," and having both what "appeared" to be a bruise on her iliac bone crest and a "burn" on her upper left cheek near her nose.

47.     That referral was part of the "investigation" to be described shortly and was deemed "unfounded."

48.     The second referral, also made by the school nurse, came less than a week later,

again complaining of a soaked diaper, and claiming the soaked diaper "appears to be from overnight;" something that would of course be impossible to determine.

49.     PLAINTIFF believes that because this second referral was so close on the heels of the prior referral, and CFS had not yet assigned anyone to investigate, the second referral was "evaluated out," and then began the involvement of NGUYEN and POWELL, who through methods unknown but seemingly necessarily illegal, obtained Kelsey's medical records, reviewed them, and then made contact with Jeremy regarding a meeting.

50.     In meetings that followed with Jeremy, Taylor, and unknown others, NGUYEN and POWELL were made well aware of Kelsey's MSP3 diagnosis, the prognosis Jeremy and Taylor had been given about her anticipated longevity with her disease, the level of care she needed and was receiving, and of how Jeremy, with Taylor's help, had obtained an IHSS worker, built an entire daily life routine around ensuring Kelsey's needs were met, in that she was fed, bathed, clothed, and taken to school as normally as could be hoped for with a child afflicted with MSP3.

51.     Jeremy and Taylor acknowledged it was difficult but did not ask at any time for any support or services from CFS, and certainly not their involvement in their family.

52.     In one or more of these meetings NGUYEN and POWELL began pushing that Jeremy should place Kelsey in a residential care type facility located in San Bernardino California, a location more than a five (5) hour drive from Jeremy's home.

53.     Jeremy made it clear to them he might do that at some time, but that because the disease Kelsey was afflicted with would mean with 100% certainty she would have a greatly shortened lifespan, and he did not wish to place his daughter in some location over five (5) hours away, but rather see her and care for her on his own for the limited time she had left,

with the support of Taylor and his family supports in the area. He had made clear the tremendous "commute" Jeremy already had in his life due to living in Modesto and working in the S.F. Bay Area, and how he feared if Kelsey was placed a far distance from him it would be impossible to truly maintain and nurture his relationship with his daughter.

54.    It was also told to NGUYEN and POWELL that Kelsey also received weekday and on-call support by an IHSS worker, Mr. James Owsley.

55.    It was prior to these early 2018 time referrals being made, that persons at the daycare "My Friends" brought to the attention of Jeremy and Taylor that they felt they needed to contact the school and make a complaint because Kelsey was showing up at the daycare after school with her diapers filled with urine and feces. Taylor did in fact make that phone call to the school and register the complaint on behalf of Jeremy.

56.    It was not long after that, when complaints / referrals started being made by personnel from Kelsey's school about the allegedly "soaked diapers" including the one that "appeared" to be from overnight.

57.    Plaintiff is informed and believes the onset thereafter of complaints by the school nurse were retribution for the complaint he had lodged through Taylor with the school, and an effort to deflect the deficient care and treatment Kelsey was receiving while in school and provided an in-school aide under an educational program Kelsey was enrolled in that was funded by state and/or federal money.

58.    In the meeting with NGUYEN and/or POWELL in September of 2018 Jeremy and Taylor expressly told NGUYEN and POWELL that Kelsey had about a 2hr and 15 min ride to the school for Kelsey each school day in a bus that picks up numerous other special needs and/or disabled children in wheelchairs and such.

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

59.     That fact readily and singularly explained the claims in a referral that Kelsey was arriving at school with a urine saturated diaper.

60.     Taylor explained that Kelsey's diaper was changed every school day just prior to the bus's arrival at the home to transport Kelsey to school.

61.     As late as April of 2019, when the Court was presiding over the jurisdiction trial, which contained allegations of Jeremy's allegedly horrible care of Kelsey, which was argued as therefore a basis for CFS to keep B.W. from his father's care, the Court acknowledged being unaware of any evidence about some "2-hour" drive to school after Jeremy testified about it in Court.

62.     This is just one of the examples of how the Court was fooled, hoodwinked, and kept in the dark by the child welfare agency that is often commonly referred to as the "arm of the juvenile dependency Court."

63.     CFS, NGUYEN, POWELL, HUBER, TOUT, LLAMAS, ANSHUTZ, MADDOX, CONTRERAS, WILBUR, DHANOTA, PANNELL, MADRIGAL, nor any other social worker, social worker supervisor, CFS executive or management level personnel, nor any attorney for CFS/COUNTY had ever bothered to advise the Court of the facts and circumstances of the 2018 referrals or investigation at all, much less the information provided to the CFS personnel and included in their DSL's for that period of time, all of which would have shed light on the claims and allegations that were being made against Jeremy as a parent and provided supporting evidence favorable to Jeremy when trying to have B.W. returned in the juvenile dependency Court proceedings.

64.     The two referrals from September 2018, were not included in the Detention Report prepared by WILBUR and/or BARTLETTS for the March 4th, 2019 hearing regarding B.W.'s

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

removal, despite the fact the date span for referrals covered began in 2009 and ran through February of 2019.

65.     The two referrals from September 2018 were mentioned briefly in a "listing" of referrals in the Jurisdiction Report, but no DSL's containing the contacts with Jeremy, Taylor, or anyone else were included with that report, which DSL's that were provided to the Court and attorneys for the parties in fact had a "start" date of January 25th, 2019.

**PRELUDE TO MONTH PRIOR TO KELSEY PASSING**

66.     On February 27th, 2019, in the morning hours, exact point unknown, Kelsey passed away in her sleep at age ten (10) from her near (6) year battle with MSP3 Sanfilippo Syndrome.  When Jeremy learned of the diagnosis with Taylor by his side years prior, and learned that it was an extremely rare disease which was uncurable and always fatal, he was told and she would not be expected to live into adulthood and would likely live to between ten (10) and thirteen (13), possibly fifteen (15) years of age.  On this day she was age ten (10).

67.     On that morning, Jeremy went to wake K.W. for school only to find her cool expired body in her little bed. Neighbors have described the anguished cries of Jeremy Westfall coming from that home that morning as the most haunting and gut-wrenching memory they could ever have.

68.     Collecting their thoughts through their tears, Taylor and Jeremy arranged for another parent to take B.W. to school before the scene got chaotic at the home with law enforcement, coroner's office personnel, etc. As it turned out, the response was swift by law enforcement and they arrived prior to B.W.'s departure for school.  As B.W. left for school, Jeremy fought to compose himself and say to B.W. that Kelsey had gone to be with the angels.

69.     That same day, social worker NGUYEN and public health nurse POWELL from the

COUNTY showed up at the Westfall home, literally arriving before the child's body had been removed from the home to the coroner's van.

70.      Modesto PD had also responded to the scene and been through the home as part of that response prior to two of the officers (Sgt. Nicolai and Detective Dodge) ending up speaking with NGUYEN and POWELL at the scene, as described below.

**"INVESTIGATION" BETWEEN JANUARY 24th AND FEBRUARY 26th, 2019**

71.      As noted previously, NGUYEN and POWELL had been following Jeremy and some perceived issues with medical and/or personal care of Kelsey, essentially all related to her MSP3 diagnosis, since the September 2018 time frame discussed above.

72.      But then as the result of a January 24th, 2019 referral from a worker assigned to Kelsey at the Valley Mountain Regional Center (VMRC), a private corporation that contracts with the California Department of Developmental Services to provide or coordinate services and supports for individuals with developmental disabilities, NGUYEN and POWELL had become again involved in Jeremy and his children's lives, as well as Taylors.

73.      By the time of this referral NGUYEN and/or POWELL had reviewed the entire CWS/CMS files pertaining to any prior referrals or criminal history of Jeremy within CWS/CMS, and were personally aware of the information they had gathered during the earlier last-quarter of 2018 time frame from Jeremy, Taylor, James, and others.

74.      By the date of Kelsey's passing on February 27th, 2019 they were well aware that though there were a number of child welfare referrals prior to September of 2018 where Jeremys name came up, they were all at their base the result of the issues with Klorissa Dawson and her substance abuse when Jeremy and Klorissa .

75.      The Defendants however, never advised the Court about the investigation in

September of 2018, not in any way, shape, or form.

76.    From information provided by NGUYEN to WILBUR and BARTLETT, or obtained by their own review of the CWS/CMS, from 5/14/2009 through  there were thirteen (13) referrals – excluding the September 2018 referrals, of which seven (7) were "evaluated out," meaning no investigation done at all, two (2) were "unfounded," which means "any report of child abuse or neglect for which it is determined, after an investigation, that no credible evidence of the alleged abuse or neglect exists," three were "substantiated," which means, "circumstances where the evidence makes it more likely than not that child abuse or neglect.

77.    Every single referral had to do with something regarding Ms. Dawson and related to physical abuse of Kelsey and/or her circumstances of drug and alcohol abuse or both, and though Jeremy ("father") is mentioned in four (4) of them, they are all ones that were "evaluated out."

78.    The referral from the VRMC reporting party did not include a single claim or allegation regarding any abuse or neglect of either B.W. or G.W.

79.    WILBUR and BARTLETT, in order to prepare the list of referrals for inclusion in the Detention Report submitted to the Court regarding removal of B.W., had to have seen all the referrals for all years, and they did.  However, WILBUR and BARTLETT intentionally excluded listing the referrals from the last quarter of 2018 in the Detention Report.

80.    The September 2018 referrals were subsequently included in the Jurisdiction Report signed by WILBUR and PANNELL but had zero DSL logs attached about investigation of these referrals and zero discussion of the investigations or the information received during the investigation of those referrals.

//

**JANUARY 25TH INTERVIEW OF JAMES OWSLEY, KELSEY'S IHSS PROVIDER**

81.     Regarding investigating the January 24th, 2019 referral, on February 25th, 2019 NGUYEN and POWELL went to Jeremy's home and met and spoke with James Owsley, and also saw and observed B.W., who was noted as appearing "healthy," with no mention of any marks or bruises on the child in NGUYEN's written account of the encounter in her DSL's.

82.     James introduced himself and provided NGUYEN and POWELL with his IHSS identification card, he advised NGUYEN and POWELL he had been Kelsey's IHSS worker for six (6) months and that he works all day and is on call as needed.

83.     James told NGUYEN and POWELL he had personally attended several medical appointments for Kelsey with Jeremy and Taylor and that he had known Jeremy for years.

84.     He acknowledged noticing the mark on Kelsey's chin when she had been dropped off on the bus and stated, "I think it came from the day care," telling them, "it wasn't there in the morning." He advised the daycare was named "My Friends," a pediatric day healthcare center daycare in Modesto.

85.     At no time did NGUYEN and POWELL attempt to speak to anyone from the daycare.

86.     James also noted that the mark may have come from the mask (nebulizer mask) she has to wear around her nose and mouth when she receives her albuterol treatments.

87.     James further told NGUYEN and POWELL that Kelsey's muscles in her back were getting weak and as a result her head tilts to the side more and this causes her to bump her head on the couch and on the side of her wheelchair.

88.     NGUYEN would also write that Taylor had told her the same things about Kelsey as in the prior paragraph, when Taylor was contacted by phone while NGUYEN and POWELL

24

were at the home.

89.    When asked if James had any concerns regarding Jeremy's ability to care for his children he stated that he did not.

90.    Although it was included in the Detention Report of March 4th, 2019 that "a neighbor was caring for Kelsey in the morning at her father's house, a neighbor incorrectly described as a "she," nothing was said at all about James Owsley the actual "neighbor" who cared for Kelsey in the morning and was Kelsey's IHSS worker; nothing was said about the fact Kelsey had an IHSS worker.

91.    Nothing about what Jeremy, Taylor, Frank, or James said about any of the issues pertaining to care of Kelsey, Jeremy's parenting and care of the children, or in any way, shape, or form favorable to Jeremy or reflecting accurately or positively on the true facts and circumstances pertaining to he or his children was included in the Detention Report.

92.    The Detention Report was a selective recounting of the information pertaining to this family, a manicured and omission riddled fraud upon the Court.

**JANUARY 28th INTERVIEW OF JEREMY BY NGUYEN**

93.    On January 28th, 2019, NGUYEN went to Jeremy's home and interviewed him.

94.    Jeremy quite promptly upon talking explained that he was aware the school (Sonoma Elementary School) is contacting CFS and picking on him because he is a single father.  NGUYEN characterized everything that Jeremy said thereafter about the circumstances as Jeremy "bad mouth[ing]" the school.

95.    Jeremy said the school nurse had "something against him" based on the fact the nurse had kept calling him numerous times about marks on Kelsey's face, though they continued to both speak of only one mark.

96.     It was a discussion about a single mark on Kelsey's chin – the same mark NGUYEN and POWELL discussed with James Owsley about on January 25th.

97.     Jeremy told NGUYEN he did not see the mark on Kelsey's chin when he left for work at 3 a.m. in the morning, however, the caretaker [James] did notice it when he gave Kelsey a breathing treatment, referencing an albuterol treatment delivered through a face mask connected to a nebulizer machine.

98.     NGUYEN made a comment about being concerned that the explanation of what she described as the "sustained mark" on Kelsey's chin, which upset Jeremy, who knew fully well nothing he had done caused such mark.

99.     In fact, it was later determined that the mark was the result of a small skin bacterial infection known as impetigo and NGUYEN was promptly advised of this finding.  This type of infection was more common in children than adults, and readily treated with a topical antibiotic.

100.    NGUYEN, already well aware of Jeremy's desire to care for his child Kelsey, again discussed placement of Kelsey outside of his care and Jeremy responded he has all the help that he needs, pointing out Kelsey goes to daycare every day of the week and he has a caretaker (James) who watches her every day.  Jeremy added that he works closely with VMRC and receives various services through them, point out specifically the help they gave with the referral to "My Friends Day Care" where Kelsey was currently in attendance.

101.    NGUYEN told Jeremy that Kelsey had several missed medical appointments.

102.    Jeremy replied that he was unaware of where to take her or any such appointments because his mother – who had cared for Kelsey until less than a year prior has had Kelsey in her care.

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

103.    NGUYEN then gave him a sheet of paper of the missed medical appointments and reasons for the appointment within the past year.

104.    Jeremy became tearful and indicated it had been overwhelming to care for Kelsey since her health had recently digressed, mentioning he was unable to play with her and had considered placing her into a home, but said he would feel guilty if she passed away in a facility.

105.    NGUYEN asked about Kelsey's primary care physician and Jeremy told her she attends Golden Valley Health Center on 6th Street in Modesto, and she had been to the emergency room at Memorial Medical Center and Valley Children's Hospital in Madera as well.

106.    NGUYEN never once spoke to or obtained records from any of those facilities over the next month prior to the removal of B.W.

107.    Jeremy denied any mental health issues, openly discussed his use of marijuana and his possession of a valid medical cannabis card, which he used to deal with back pain related to scoliosis he has had since he was a child.

108.    Jeremy acknowledged prior convictions for domestic violence, marijuana possession, and "terrorist threats," telling NGUYEN they were all over five years old at that point and pointed out he is not on probation.

109.    Jeremy also advised her the biological mother Ms. Dawson was in jail in Arkansas due to drugs and there is no custody agreement to his knowledge in Court, but he has been the one with primary custody as between the two since Kelsey was five.

110.    After NGUYEN left, Jeremy advised Taylor about the missed appointments, she took the information, contacted the facilities/providers and rescheduled the appointments,

doing so all in a matter of two days, and Jeremy and/or Taylor then contacted NGUYEN and advised her all the appointments had been made.

**FEBRUARY 1ST, 2019**

111.    Jeremy texted NGUYEN on February 1st, 2019, advising he would accept Kelsey going to the previously discussed facility in San Bernardino, but would prefer something in Modesto.

**FEBRAURY 8TH, 2019**

112.    On February 8th, 2019, NGUYEN requested a TAP staffing, which was attended by ANDERSON, PANNELL, and CONTRERAS.

113.    At the time of this TAP staffing, there still had not been a single allegation made by a single person about the care of safety of B.W. in relation to his father Jeremy in the time since Klorissa Dawson left the family in 2013.

114.    At that TAP staffing ANDERSON, PANNELL, and CONTRERAS advised NGUYEN to "proceed with a warrant" to take Kelsey and B.W. into protective custody.

115.    NGUYEN was also told to look for placements for Kelsey in advance of obtaining the protective custody orders, "then create a warrant."

116.    Nineteen (18) days would pass without NGUYEN or anyone else applying for a warrant to remove Kelsey or B.W.

117.    It is well known by CFS social workers that the odds of any warrant application they make to the juvenile dependency court, whether to obtain access to a child, or remove a child, being rejected is less than two (2) percent; there is no better bet in terms of the odds of success than applying for a warrant to remove a child in Stanislaus County.

//

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

**FEBRUARY 11TH, 2019**

118.    NGUYEN contacted Jeremy on February 11th, 2019 and advised him she had found two possible placements in the Lodi and Stockton area, near Modesto.

119.    Jeremy became tearful and said that his prayers had been answered, referring to Kelsey being able to be placed nearby versus somewhere like San Bernardino County, and expressed being thankful she could be placed close to home.

120.    NGUYEN told Jeremy she would be getting in contact with a worker from VMRC about confirming one of these placements and would update him later on the conversation with the VMRC worker.

**FEBRUARY 25TH, 2019 REFERRAL**

121.    Two weeks after the call from NGUYEN about a placement for Kelsey, on February 25th, 2019 at 10:38 a.m., the Sonoma Elementary School nurse again called in a report to the CFS Hotline saying Kelsey's health had declined since Jeremy's mother passed away.

122.    PLAINTIFF is informed and believes that the reporter was once again the nurse from Sonoma Elementary School.

123.    Though NGUYEN recorded in her DSL's that she spoke with the school nurse Marissa and a teacher named Gina at Sonoma Elementary School about the referral and took photographs of the alleged marks, and "imported" them into the CWS/CMS, no photos were ever produced in the juvenile proceedings, to the Court or Counsel.

124.    The reporter went on to say the child "showed up" with missing patches of hair, a chipped tooth, and continuous bruises that father (Jeremy) denied knowledge of as to the cause.

125.    The reporter also said the child often appears drowsy, sleeps a lot at school, and has

breathing issues, and that he/she "asked" the father to take her to a doctor and bring back "a note," but it has not happened. This reporter said Kelsey pulled out her G-tube (a feeding tube straight to the stomach that Jeremy and Taylor had taken care of acquiring for Kelsey because she needed it), had to have emergency surgery, and a prior mark on the chin is "barely healing," and the child "showed up at school" with a "red and inflamed nose that looks like it might be a rash."

126.    The reporter said father reported not knowing what happened to the child's nose.

127.    The referral was "evaluated out," no investigation done, and in response to this February 25th, 2019 referral, NGUYEN nor any other social worker went to speak to Kelsey or anyone else about Kelsey.

**FEBRUARY 25th INTERVIEW OF B.W. WITHOUT NOTICE OR CONSENT**

128.    Despite the lack of any allegations pertaining to B.W., on February 25th, 2019, NGUYEN and POWELL went to B.W.'s school (Aspire Summit Charter School - ASCS) intending to interview him.

129.    NGUYEN and POWELL did not seek permission of Jeremy in advance to speak with his then five (5) year old son prior to appearing at ASCS and had no consent from Jeremy or Klorissa Dawson to do so.

130.    NGUYEN and POWELL, had B.W. removed from his classroom and taken into a private room in the school office, then proceeded to ask him questions about his family, his home, his father, and his "mother" Taylor, and many intimate details of the Westfall family home and life, as well as young B.W.'s part in that family.

131.    The child was described as appearing clean, healthy, with no visible marks or bruises with regard to the interview on February 25th, 2019.

132.    NGUYEN would thereafter falsely make a claim in her DSL's, which NGUYEN knew would become part of subsequent juvenile court filings such as the Detention Report and W&IC 300 Petition, and potentially many others, that B.W. had seen Jeremy hit is mom on the head and demonstrated a closed fist to the forehead, saying Taylor then "cried" and told him they were going to live elsewhere.

133.    NGUYEN also claimed in her DSL's that B.W. said something about "Josh," and how he had "seen Josh with a knife," saying he was scared because Josh will try to kill him," but per NGUYEN he was unable to identify who Josh was or explain the relationship.

134.    Neither NGUYEN or POWELL made any effort to set up a TAP staffing as a result of anything B.W. said, no W&IC 300 Petitions were filed, and absolutely no effort made to even contact much less actually speak to Jeremy and/or Taylor and inquire about what B.W. was alleged to have said.

**FEBRUARY 25TH – INTERVIEW OF AUNT STEPHANIE**

135.     On February 25th, 2019, NGUYEN spoke with paternal aunt Stephanie by phone and recorded her version of what Stephanie told her in her DSL's.

136.    NGUYEN knew that the person(s) drafting a Petition and/or Detention Report would be using DSL's she created in order to put together allegations designed to sustain W&IC 300 jurisdiction over a child/children.

137.    The portrayal of the content of the discussion with Stephanie was virtually entirely false; at the very least an omission riddled version of the actual conversation.

138.    The sum total of what was alleged Stephanie had allegedly said to NGUYEN about Jeremy and/or Kelsey, put into the Petition and/or Detention Report was as follows;

> "On February 25, 2019, SW Nguyen received a phone call from a paternal great aunt, who reported she has concerns with Mr. Westfall's aggressive behaviors.  She

31

filed for a restraining order against him in 2012 when he attempted to hit her.

On February 25th, 2019, the paternal aunt stated that she suspects that Mr. Westfall smokes marijuana around his children."

## KELSEY PASSES AWAY – FEBRUARY 27, 2019

139.    On the morning of February 27th, 2019, when Jeremy went to wake his daughter and start the rather lengthy process of getting her up, dressed, and fed before heading to school, he found his oldest child cool to the touch and quickly realized she was deceased.

140.    Jeremy's haunting screams woke neighbors on both sides of his home, as the immediate pain and anguish was overwhelming.

141.    That same day, a staff person named Gina Jeppson at Kelsey's school called and spoke with POWELL and advised her that Kelsey passed away.

142.    NGUYEN and/or POWELL brought this to attention of unknown others at CFS and a TAP meeting was attended at 10:00 a.m., with Defendants NGUYEN, POWELL, LLAMAS, ANSHUTZ, CONTRERAS, TOUT, and HUBER in attendance.

143.    At the time the decision was made to remove B.W. during this TAP meeting, not a single one of the Defendants knew any details whatsoever as to the cause of Kelsey's death, though all were fully informed of the nature of Kelsey's MSP3 diagnosis by NGUYEN and POWELL; NGUYEN and POWELL knew this before the TAP meeting.

144.    At the time the decision was made to remove B.W. during this TAP meeting, although the participants were advised Jeremy had two (2) prior charges related to domestic violence – both related to his time living with Klorissa Dawson when she was actively using/abusing drugs or alcohol – they were also made aware the last criminal "anything" involving Jeremy was over five (5) years and six (6) months prior, and the last "domestic violence" related conviction was over ten (10) years old; NGUYEN and POWELL knew this

before the TAP meeting.

145.     At the time the decision was made to remove B.W. during this TAP meeting, that Jeremy was a prescription card carrying medicinal marijuana use and had been since 2009 for conditions and symptoms related to his childhood scoliosis diagnosis; NGUYEN and POWELL knew this before the TAP meeting.

146.     At the time the decision was made to remove B.W. during this TAP meeting, not a single claim or allegation of abuse or neglect had been substantiated from the January 24th, 2019 referral; NGUYEN and POWELL knew this before the TAP meeting.

147.     At the time the decision was made to remove B.W. during this TAP meeting, all of the participants were aware that any missed appointments for Kelsey with medical professionals totaled two (2) in number in terms of when Kelsey was in Jeremy's care, and those appointments had been promptly rescheduled when Jeremy and Taylor learned of them; NGUYEN and POWELL knew this before the TAP meeting.

148.     At the time the decision was made to remove B.W. during this TAP meeting, all of the participants were aware Kelsey had been primarily in the care of Jeremy's mother for about five years when mother had died March 11th, 2018 and Kelsey either had to be cared for by Jeremy or go into some sort of institutional residence.  Jeremy's mother's time from cancer diagnosis to passing from cancer was approximately one year, and shortly after her diagnosis Jeremy and Taylor took over care of Kelsey in their home; NGUYEN and POWELL knew this before the TAP meeting.

149.     At the time the decision was made to remove B.W. during this TAP meeting, all of the participants were aware that appointments that were "missed," and were later claimed to be evidence of Jeremy's neglect as a parent, were appointments that had been made by

Jeremy's mother and were "annual" appointments, meaning, they had been made by Jeremy's mother and they were unknown to Jeremy and Taylor; NGUYEN and POWELL knew this before the TAP meeting.

150.    At the time the decision was made to remove B.W. during this TAP meeting, all of the participants were aware that NGUYEN nor POWELL had made any effort whatsoever to speak to any of the medical providers for Kelsey (whose medical records they obtained through unknown methods without notice and consent of Jeremy the sole lawful guardian of Kelsey), and upon which NGUYEN and POWELL were taking the position upon there were numerous important missed medical appointments for Kelsey; NGUYEN and POWELL knew they had made no such efforts before the TAP meeting.

151.    At the time the decision was made to remove B.W. during this TAP meeting, all of the participants were aware that Jeremy had made the parental decision to not place his daughter in some institutional residence setting, but rather care for his daughter because she was assuredly slated to lead a very short life and he wanted to be the one caring for her; NGUYEN and POWELL knew this before the TAP meeting.

152.    At the time the decision was made to remove B.W. during this TAP meeting, all of the participants knew that NGUYEN and POWELL had never once spoken to James Owsley even though NGUYEN and POWELL were aware from the inception of their investigation that Mr. Oswley was an IHSS support person literally living in the Westfall home and assisting in the care of Kelsey; NGUYEN and POWELL knew this before the TAP meeting.

153.    The meeting was over in approximately 30 minutes.

154.    By the end of this meeting, there was no scenario where B.W. was going to remain with his father, in determination of Defendants NGUYEN, POWELL, LLAMAS, ANSHUTZ,

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

CONTRERAS, TOUT, and HUBER. Either Jeremy was going to relinquish his child B.W. to some other person pursuant to a "Safety Plan," or his child was going to be removed from his care. It was with these "marching orders" NGUYEN and POWELL went on to undertake the actions to remove B.W. as described below.

155.     With that determination by all the aforementioned Defendants at the TAP meeting in mind, NGUYEN and POWELL left for the Westfall home and arrived at 11:03 a.m.

**FEBRUARY 27, 2019 - NGUYEN AND POWELL ARRIVE WESTFALL HOME**

156.     Upon arrival on February 27th, 2019, at the Westfall home of NGUYEN and POWELL, Jeremy became very upset at the sight of them, yelling from near the house to them exiting their vehicle, "What the fuck are you doing here," "Get the fuck out of here," "I'm serious," "Get the fuck out of here."

157.      Jeremy's father Frank Westfall came over to the two and asked that they leave, and told the two, "If you had an ounce of decency you would not have shown up."

158.     NGUYEN and POWELL's response was not, "We have to remove B.W. by agreement or force, but he is going to be removed," instead it was a lie, 'We're sorry for the loss and we've come to offer counseling and grief services."

159.     Frank pointed out, there were two Chaplains onsite, and unless either one of them (NGUYEN & POWELL) was ordained, how was it that they were going to offer services?'

160.     NGUYEN then told Frank "the agency" had concerns regarding B.W.'s "safety," and though it was now more than forty-eight (48) hours since B.W. is alleged to have said something about domestic violence between Jeremy and Taylor – but having never said a word about any physical abuse of himself by his father or anyone else – and Frank responded saying, "Those can be dealt with later," NGUYEN told Frank "they have to be dealt with

today." This was Frank's first mistake that day; he had disagreed with social workers.

161. NGUYEN began telling Frank she needed to assess Frank's home, and Frank responded telling her that was not going to happen "today" and walked away to continue attempting to console his grieving son and Taylor.

162. At that point a Sergeant L. Nicolai with the MPD asked NGUYEN and POWELL to move further down the block, reportedly saying he did not want to start a riot with the family.

163. NGUYEN told Nicolai that due to their (her and POWELL's) "investigation into the death of Kelsey, [they] needed to place [B.W.] in a safe place while the investigation is pending."

164. Sgt. Nicolai told NGUYEN and POWELL that the cause of death was "NOT" homicide and that the cause of death was Kelsey's MSP3, and he then sent over to the two Detective Dodge, an officer with several years working on cases involving abuse and/or neglect of children for MPD.

165. Detective Dodge reiterated what Sgt. Nicolai said, repeating this was NOT a homicide, and noting there were no visible marks that would indicate child abuse.

166. NGUYEN asked Dodge to reveal the details of his interview with Jeremy, and he described Jeremy explaining that Kelsey had received her typical bedtime medication and gone to bed at 7:30 the night before. Jeremy had found her at 6:45 unresponsive, and, the child was found laying the way she was specifically tucked into the bed to avoid any possible choking if she were to vomit.

167. NGUYEN then pulled out Kelsey's medical records and showed Detective Dodge what she claimed were "missed appointments," telling him the child was not receiving appropriate medical care. Detective Dodge then said they would be better off speaking to

Frank as he was more calm than Jeremy.  NGUYEN said she would like to advise Frank that CFS is "trying to prevent placing [B.W.] into protective custody and would like to assess him as a protective caregiver."  The Detective said he would explain that to Frank.

168.   Frank returned to the two COUNTY employees stating that there was absolutely no reason for B.W. to be taken from his father, and reiterating that Jeremy is a great father and B.W. is well cared for.

169.   NGUYEN nor POWELL asked a single question of Frank as to what the basis was for his opinions, and to that point in their month long "investigation" of the January 24th, 2019 referral had never once so much as sought any information from any collateral contact with actual percipient knowledge of the parenting of Jeremy or Taylor.

170.   Instead, NGUYEN and POWELL began making some claims about alleged statements by B.W. regarding domestic violence between Jeremy and Taylor, and something about how someone was possibly going to cut him with a knife.

171.   Hearing the comments about being "cut with a knife" caused Frank to slightly smile and shake his head.  He told them there was an incident where Josh, an older brother to Jeremy who was homeless and had multiple mental health issues, had taken out a knife in front of the children and made stabbing motions at people – not B.W.  or any of the children – and how Josh had in fact been arrested as a result and was in jail.

172.   Frank agreed to try and speak with Jeremy about the idea of B.W. staying with Frank and his wife Melynda and walked off to speak to Jeremy.

173.   Frank conveyed the message to Jeremy that NGUYEN and POWELL had given him, which was that if he did not agree to a Safety Plan, B.W. was going to be removed.

174.   When Frank spoke again to NGUYEN his failure to see things and agree with

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

NGUYEN's ill-informed beliefs about domestic violence, in addition to things such as telling her the removal was "unnecessary" and questioning what authority she had to go speak to B.W. at school, would later result in NGUYEN ignoring the Safety Plan and taking B.W. into protective custody while Frank was waiting at home to have his home "assessed."

175.    Frank brought Jeremy to the social workers, where he was still angry and insulted by their presence, and he spent a moment disputing any claims of lack of care of Kelsey.

176.    However, being given the ultimate Hobson's choice to have his child taken from his care and placed who knows where with who knows who, versus being placed with his father Frank, Jeremy felt he had no other choice than to sign the "Safety Plan," which only said that B.W. would stay at Frank's home.

177.    The Safety Plan did not so much as say Jeremy could not stay with him at Frank's home, much less that he could not communicate or have contact with B.W. while in Frank's care.

178.    Jeremy was told by NGUYEN and POWELL that the Safety Plan was entered into with the intent it stay in place while they "continued their investigation."

179.    NGUYEN had told Frank before parting ways that they would come to his home to perform the assessment that day.

180.    Instead of going to Frank's home, NGUYEN and POWELL left the Westfall home at 12:20 p.m. and drove directly to B.W.'s school and took B.W. into custody.

181.    In the cross-hairs of the juvenile dependency system in Stanislaus County, B.W. would not return to his father Jeremy's care, and sleep in his own bed, until late July of 2020, seventeen (17) months after NGUYEN and POWELL had entered into a Safety Plan where B.W. would have stayed in his grandparents' home, and then taken custody of the child within

38

the space of one hour.

182.    That decision by the juvenile court to return the child to his father and dismiss the case, was objected to by CFS attorney Angela Cobb and the court appointed attorney Erik Lundeberg to the very end.

**MEETING WITH LLAMAS**

183.    When no one came to Frank's home to assess it, he called CFS on February 27th, 2019 and ended up receiving a call back from LLAMAS the same day.

184.    Frank expressed to her that he understood CFS was coming to inspect his home so he could receive B.W. in his home pursuant to the Safety Plan.

185.    LLAMAS told Frank that due to his "behavior," including the fact he felt "forced" to sign the plan, B.W. was placed in protective custody.

186.    These comments, the notes and documenting of events at the Westfall home that same day by NGUYEN reveal the common, every day, routine behavior of CFS social workers. There is no provision in the law requiring from parents or anyone else subjected to one of CFS's "investigations," an iota of "cooperation" with the social workers prior to Court ordered jurisdiction over a child/ren. There is certainly nothing in the law requiring unquestioning agreement with the positions and perspectives of social workers on issues of risk and safety of a child, of a parent, or of anything else with which the parent or anyone else disagrees.

187.    However, so unbridled and unlimited is the arrogance and sense of omnipotence of the Stanislaus County CFS social workers over families, that decisions are frequently made that alter children and families lives negatively and irreparably based merely on their perception of a parent or family member's "cooperation."

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

188.    The liberal use of words as to parents connoting a lack of "cooperation," or being "uncooperative" are frequently and routinely used by Stanislaus County CFS social workers in reports to the Court, and in the notes that they take of an investigation – as was the case with the notes taken of the investigation in this matter involving Kelsey and B.W.

189.    This behavior, this unlawful social-worker-centered factor is used by the social workers and it is a practice and/or custom of the COUNTY social workers to use it, in order to create a false portrait of a parent and better ensure the ability of the CFS to prevail upon the juvenile court to retain custody of children they have removed, or otherwise interfere in their parental rights.

190.    COUNTY social workers are not trained about the right of parents not to cooperate with them, to disagree with them, and in fact, trained that the parents lack of cooperation is a factor to be considered when making decisions about whether to remove the parents' children.

191.    Jeremy and Taylor went to the CFS office as well later on February 27th, 2019 and talked with LLAMAS.

192.    Jeremy told LLAMAS that he was "coached" and "forced" to tell VMRC he wanted his daughter in placement by NGUYEN and POWELL.

193.    LLAMAS told Jeremy about a TAP staffing before the social workers came to his house on the morning of February 27th, 2019, that LLAMAS described as a "previous" staffing, in which a "decision[]" was made that if Jeremy "could not place [Kelsey] voluntarily with VMRC then [her] agency would obtain a warrant for both children."

194.    This statement by LLAMAS is a clear articulation of the "take one, take all" practice in the County of Stanislaus.

195.    This statement by LLAMAS is a clear articulation of the allegations in Paragraph ??

above.

196.     Jeremy told LLAMAS what he had already told NGUYEN and POWELL when they were performing their "investigation" of the January 24th referral, which was that Jeremy had gone to the NICU countless times for his children, and as to the claim of Kelsey's missed appointments that he was unaware of them because mother who had cared for the child for years before he took over again, was dying of brain cancer and she handled all the doctor scheduling.

197.     Jeremy also advised LLAMAS that VMRC does not see the concerns with his care and that he had to have his daughter in day care for a number of hours a week so she would not lose her spot.

198.     LLAMAS brought up the story of B.W. saying Jeremy punched Taylor in the head, and how he allegedly portrayed it himself with a punch to the forehead, at which point Taylor began laughing, telling LLAMAS she would never let a man put a hand on her and if he did, she would leave.

199.     Taylor and Jeremy denied there had been any domestic violence in the home the night before as well, which was something NGUYEN claimed B.W. talked about after NGUYEN and POWELL kidnapped him from school the day prior, denied police calls to their home for fighting, and denied either being arrested for such.

200.     Taylor asked LLAMAS to please take a picture of her face or anywhere else on her body right then and there, pointing out the obvious that is she was so abused and as recently as last night there should be some mark on her; LLAMAS refused to do so.

201.     LLAMAS made no effort to ensure that her own observation of the fact Taylor had not a mark on her, or that she had offered to have photographs taken of her – which LLMAS

declined – made it into a single report submitted to the juvenile court during the seventeen (17) months B.W. was kept from a normal life at home with his father and Taylor.

202.    Jeremy expressed to LLAMAS all the things he had done to support his children and explained how some marks reported on Kelsey's face have come from her attendance at day care and explained something they do at daycare that could have caused a red spot reported to be on Kelsey's chin.  Jeremy explained that at the daycare they would put Kelsey down on a rug on her stomach.

203.    So deep was Jeremy's despair at the removal of his son, on the day of the death of his daughter, that as they left the meeting, LLAMAS felt compelled to tell Taylor to make sure Jeremy is not alone – the man she was just making out to have committed domestic violence on Taylor several times, and most recently the night before – and Jeremy said he would never do anything to himself as he has children to live for.

204.    Nothing about the Safety Plan entered into, nor anything in the prior paragraphs about any of this exculpatory, or contradictory, or context clarifying information from Taylor and Jeremy was provided to the Court in the Petition, Detention Report, or Jurisdiction reports that WILBUR, BARTLETT, PANNELL and DHANOTA were involved in creating; these items and more contained in the CFS's own DSL's was virtually entirely omitted.

205.    LLAMAS recorded in her DSL entries her opinion, which was completely contrary to the facts, that, "NGUYEN was unable to safety plan with the family due to father's behavior and feeling forced to do so."

**DETENTION REPORT / DETENTION HEARING**

206.    WILBUR was assigned to draft the W&IC 300 Petition, and the Detention Report that accompanies such Petition filings, both presented to the juvenile Court at the same time.

42

207.    PLAINTIFF is informed and believes, that WILBUR is the one who also is tasked in her position with the COUNTY to gather relevant documents that are related to whatever circumstances caused the COUNTY to yet again be taking children from their parents, including but not limited to such things as police reports, medical records, Emergency Response Referral Information and background printouts, photographs, school records, etc.

208.    PANNELL, as her supervisor, is responsible for checking the work product of WILBUR and verifying the evidence and information that is going to be presented to the juvenile Court in the context of a situation involving a possible detention or continued detention of a child from his/her parent.

209.    WILBUR drafted her Petition, the Petition PANNELL would thereafter but prior to filing, review, edit and approve for filing, then sign under penalty of perjury along with WILBUR before filing with the Court.

210.    WILBUR had access to, and did access and review for preparation of the Petition and Detention Report, all DSL entries in the CWS/CMS regarding Jeremy, Klorissa, and all of their children, which database contains any and all child welfare agency contacts statewide with the family, not just COUNTY contact.

211.    Therefore, all of the prior facts and history described hereinabove, was in the CWS/CMS WILBUR reviewed as of March 1st 2019 which is the date WILBUR and PANNELL signed the Petition and Detention Report.

212.    At no point in the Court filed Petition or Detention Report, did WILBUR or PANNELL inform the Court regarding any of the following, and where lies were ;

    - Any of the positive things said about Jeremy's parenting generally by James, Taylor, Frank, or Jeremy

43

- Any of the positive things about the care and extensive efforts to care for Kelsey generally, as well as any of the extensive efforts undertaken by Jeremy and Taylor to get Kelsey a G-Tube so she could receive nutrition

- Anything about the fact the disease Kelsey suffered from, MSP3, is a 100% fatal disease that commonly results in death as young as age ten (10), Kelsey's age; but Kelsey having MSP3 was included

- Anything about the 2 hour plus travel to school which explained the saturated diapers; but the saturated diaper complaints were included in the Petition

- Anything about the explanations given by James and Jeremy about marks on Kelsey having occurred at the daycare, or from the albuterol treatment mask, or from the related weakness in Kelsey's back and neck muscles causing her head to flop and bump things; but the fact there were marks was included/alleged

- Anything about the fact Jeremy had obtained an IHSS worker who was with his child and/or on standby to assist at any time, and lived next door

- Anything about how his live-in girlfriend Taylor assisted in the care of Kelsey and B.W.

- Anything about the fact appointments were missed as the result of the fact the paternal mother had been caring for the child, but contracted cancer (from which she eventually died) and she had scheduled appointments that were not conveyed to Jeremy, some of which were annual appointments made a year prior when paternal grandmother had care, custody, and control of Kelsey through agreement and to assist Jeremy make it through his 10-12 hour workdays

- Anything about how Jeremy and Taylor had rescheduled all medical appointments

within two days of being informed by NGUYEN of missed medical appointments; but included claimed "no shows" and "cancellations" at medical appointments

- Anything about the two police officers, including a child abuse detective (Dodge) telling NGUYEN and POWELL that Kelsey's death was not a homicide

- Anything about Jeremy and Taylor's meeting and statements on February 27th, 2019 with LLAMAS, including the offer that LLAMAS take any pictures of Taylor she wished as they would show no marks, scratches, or bruises on Taylor despite the claim being reported to them was that Bentley said they had a physical alteration the very night before (February 26th, 2019)

- Anything about the fact NGUYEN and POWELL had entered into a Safety Plan with Jeremy and Frank for Frank to take placement of B.W.

- Anything about Jeremy having agreed to place Kelsey in care at a local placement per NGUYEN's request

- Anything about what Stephanie had said regarding Jeremy as a parent that Stephanie actually said, which included the following,

    - any reference to Jeremy being an "angry man" was to her perceptions of Jeremy six years ago "but he has changed over the past few years"

    - she had told NGUYEN that she had exaggerated the circumstances of the incident with Jeremy she used to obtain the restraining order

    - Jeremy has a good heart, is a good dad, and she never felt the children were in danger or neglected by Jeremy

    - She never said she suspected Jeremy smoked marijuana in front of the children

    - Said Kelsey was clean, fed, made her regular noise[s] and never seemed

unhappy

- She felt comfortable leaving [G.W.] with Jeremy for overnight visits and G.W. had just [stayed] with Jeremy for a week in January.

- She did not believe [B.W.] should have been removed

213. The Petition and/or Detention Report also included the following allegations about things / circumstances for which NGUYEN, POWELL, WILBUR, BARTLETT or PANNELL, did no inquiry of Jeremy or Taylor, or the actual reporting party at all,

- claims that Kelsey had appeared "very dirty" on one day because her shirt had a "huge brown stain on the front and the g-tube site is very dirty with formula stuck to her skin

214. The Detention Report contained the following statements that were completely false, and are addressed in discussion regarding the April 22nd, 2019 telephone call with MADDOX below,

> "On February 25, 2019, SW Nguyen received a phone call from a paternal great aunt, who reported she has concerns with Mr. Westfall's aggressive behaviors. She filed for a restraining order against him in 2012 when he attempted to hit her.
>
> On February 25th, 2019, the paternal aunt stated that she suspects that Mr. Westfall smokes marijuana around his children."

215. Jeremy attended the March 4th, 2019 Detention Hearing, a hearing where the standard applied in analyzing whether the agency had met its burden of showing that B.W. was a child "described" by one or more W&IC 300 sections (a-g), is "prima facie," meaning, whatever the CFS social workers put in the Petition, regardless how outlandish or impossible, it will be deemed to be "true."

216. The Detention Report failed to advise the Court of a single one of the contradictions in evidence obtained by speaking to Frank, Jeremy, Taylor, or James Owsley, the Court had

no basis to even inquire about those issues contrary to the CFS's position.

**FRAUD ON THE COURT AFTER DETENTION**

217.     While reporting far less than the whole story, omitting exculpatory, mitigating, or contradictory evidence, and misrepresenting facts and circumstances the entire time even before dependency proceedings were initiated, CFS social workers continued during the course of the juvenile proceedings to engage in the same behavior, and each new state actor of CFS that became involved participated in the same or similar behaviors – it is a culture in CFS.

218.     The following are not the sum total of the conduct just described, merely very significant examples.

219.     During the juvenile proceedings, an unknown CFS social worker, had reached Klorissa Dawson by phone.  The reports submitted to the Court recounted numerous efforts to reach Ms. Dawson, however, even after she had been reached and had been spoken to, no report ever indicated that had occurred.

220.     Ms. Dawson would later contact Jeremy and advise that she had indeed been contacted by a COUNTY social worker, who questioned her about Jeremy.

221.     Ms. Dawson described to Jeremy that she spoke very positively about him and his love of the children and good parenting, but the person on the other end of the line did not seem to want to hear it.

222.     Ms. Dawson explained that the issues that they had as a couple with domestic violence were all related to her drug use, and frequently were in fact Jeremy trying to stop her from leaving the home with the children, or going out to seek more drugs or alcohol, and she made it very clear that she had been the one with the issues and had told lies about Jeremy on

a couple of occasions to get back at him or cover for her own indiscretions.

223.     Absolutely none of this information was ever relayed to counsel for Jeremy, or the Court, by the social worker, who PLAINTIFF will designate as Doe 1 for purposes of this Complaint.

224.     Further, on or before April 22nd, 2019, Stephanie learned about how her words had been twisted and used to convince the Court B.W. should remain detained from his father.

225.     Stephanie therefore called CFS and spoke with a social worker MADDOX on April 22nd, 2019.

226.     In that phone call Stephanie was reported by MADDOX to have said all of the following, in *italics* is what Stephanie would testify if called she told NGUYEN but was excluded from the reporting of her call with NGUYEN, <u>underlined</u> means it was told to MADDOX as well,

- NGUYEN had twisted her words and she was not happy about it.

- She had [G.W.] in her home for 6 years, and back when she got him – 6 years ago - Jeremy was an angry man but he has changed over the past few years.

- She said back 6 years ago when she was sharing custody of [G.W.] with Mr. Westfall and Ms. Dawson was in jail, she learned Dawson was being released and CPS had cleared the home for Dawson to return.

- She was concerned by this and got emergency custody of [G.W.] [which] made Mr. Westfall angry, stating he threatened her and so she obtained a restraining order (3 year, but no longer in effect) against him; *<u>she had told NGUYEN that she had exaggerated the</u>* *<u>circumstances of the incident with Jeremy she used to obtain the restraining order.</u>*

- Jeremy can be aggressive if his family is being threatened but has a good heart.

- *Never felt that the children were in danger or neglected by Jeremy.*

- She told NGUYEN she knew Mr. Westfall smoke marijuana and asked [Jeremy] he didn't use in front [G.W.]; *never told NGUYEN suspected he smoked marijuana in front of the children.*

- Said [marijuana] legal in CA and if state not concerned, neither is she.

- Said Kelsey was clean, fed, made her regular noise[s] and never seemed unhappy.

- She felt comfortable leaving [G.W.] with Mr. Westfall for overnight visits and G.W. had just [stayed] with Jeremy for a week in January.

- Said Jeremy changed over the past few years and is a good dad.

- She did not believe [B.W.] should have been removed and felt NGUYEN twisted her words to be able to remove B.W. and she is upset about that.

227.    The very next day, on April 23rd, 2019, MADDOX filed an "Addendum Report" in the juvenile proceeding ahead of the scheduled Jurisdiction Trial of April 25th, 2019.

228.    In the Addendum Report filed April 23, 2019, MADDOX did not inform the Court, or the parties in her report, that she had any conversation whatsoever with Stephanie, much less the content of that conversation that was favorable to Jeremy and/or the proposition that B.W. should not remain separated from his father.

229.    With the fraud on the Court up until the point of the Jurisdiction and Disposition hearings in April of 2019 having been successful in misleading the Court, the matter of B.W. and the juvenile dependency case was transferred to a "reunification worker" named MADRIGAL.

230.    In the Disposition phase of a juvenile proceeding, the parents are given "services" that CFS has determined they need.

49

231.    The portions of the Petition that had specifically been alleged for the purpose of having the Court find that Jeremy had in some way caused or contributed to the death of his daughter Kelsey, a charge arising under subsection "f" of W&IC 300, and captioned in the judicial counsel forms used to constitute an "f" claim as, "Caused Another Child's Death Through Abuse Or Neglect," were stricken at the jurisdiction trial.

232.    However, the Court left in all of the allegations in the "b" charge against Jeremy which were a repeat of the "f" charge, a charge captioned in the judicial counsel forms used to constitute a "b" claim as, "Failure To Protect," which were accompanied by "check box allegations" that "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, "X" as a result of the failure or inability of his or her parent [ ] to supervise or protect the child adequately, "X" by the willful or negligent failure of the parent [ ] to provide the child with adequate food, clothing, shelter, or medical treatment, and, "X" by the inability of the parent [ ] to provide regular care for the child due to the parent's [ ] mental illness, developmental disability, or substance abuse.

233.    The CFS attorney used the continued inclusion of the allegations pertaining to Kelsey to argue that Jeremy's failure to properly care for Kelsey was an additional reason to keep his son from being returned to his care.

234.    This completely false portrayal of the reality of a man who had obtained a G-Tube for his daughter, obtained IHSS services, arranged for her to continue school and go to a pediatric day care, rescheduled all missed appointments with the assistance of Taylor as soon as they were learned about apparently did not matter, and of course so much other evidence and information as described above was significantly hidden from the Court by the actions of CFS aforesaid the Court was fooled.

50

235.    The Court did rely on the false portrayal of the circumstances as to Kelsey, her care and her death, but did specifically hang on the "domestic violence" claims though, despite both Jeremy and Taylor denying any such thing had occurred.

236.    Taylor denied any domestic violence had ever occurred between her and Jeremy from the very first time she spoke with any social worker from CFS, which was on February 25th, after the events at the Westfall home, and every social worker from CFS thereafter, and also testified to that point in the juvenile proceedings.

237.    There had been evidence in the possession of CFS since April 10th, 2019, that B.W. denied to two different social workers (one called a "placement specialist") that he had ever seen any domestic violence between his father and Taylor.

238.    On April 10th, 2019, MADDOX and DHANOTA met with B.W. at school, where at such time B.W., after saying as he did repeatedly that he missed his dad, was asked if he has seen his parent's (which to B.W. meant Jeremey and Taylor) fight, and the child said they "argue but that's it."

239.    B.W. was asked expressly if his father ever hit his mother and he replied, "no."

240.    This information was somehow absent from the DSL's that had been printed and produced to all counsel up until the date of April 24th, 2019, even though the date ranges that had been printed and produced to all counsel as a discovery update for trial up until that point would have included April 10th, 2019.

241.    Jeremy would later on December 11th, 2019, upon retaining new counsel, submit to a polygraph examination that he passed completely, denying having ever caused Taylor Webb physical harm, denying having had any kind of argument the night before Kelsey passed away, and denying he had ever hit or attempted to hit Stephanie Lowery.

242.    The polygraph results were sent to all counsel involved in the juvenile dependency proceeding without any reference to filing it in the Court or anything of the sort. It was also sent to everyone else associated with the case, such as Jeremy's father and step-mother who were the placement for B.W. at the time, and the therapist Judi Schardijin, who was providing therapy for Jeremy pursuant to Court order.

243.    The CFS attorneys promptly filed a motion to exclude the polygraph report.

244.    Thereafter, on December 18th, 2019, Ms. Schardijin contacted Counsel for Jeremy. Counsel had made arrangements to speak with her earlier that day, but she had been busy, and was kind enough to call back at approximately 9:25 p.m.

245.    Counsel explained he had desired to speak with her so he could decide if he needed to subpoena her for an upcoming hearing where Counsel was attempting to get more visitation with B.W. and his father or his return home.  Counsel explained if he could simply find out what her decision was on a debate between Jeremy and all other sides of the case which was whether Jeremy needed actual domestic violence classes or simply could deal with such issues through counseling, then I could possibly avoid bringing her to trial as a witness.

246.    Counsel commented that the social worker MADRIGAL had said she would send over the anticipated "report" of Ms. Schardijin on Jeremy's progress in counseling, and the decision on "classes vs. counseling" by 5:00 p.m. that day but it had not been received.

247.    With that comment to Ms. Schardijin, she pointed out that was odd, as she had sent it to the social worker MADRIGAL two days earlier.

248.    Ms. Schardijin went on to say that she had sent her report to MADRIGAL two days earlier, but MADRIGAL then either "returned" or "responded" saying that Ms. Schardijin needed to "modify the report" to say Jeremy was receiving counseling as an "Offender."

249.    Ms. Schardijin said she had submitted the original to MADRIGAL with the polygraph of Jeremy attached as well, and MADRIGAL called her and told her that she needed to remove the polygraph results from her report.

250.    MADRIGAL had not sent Schardijin the April 10th, 2019 DSL record of the denial of any domestic violence from B.W. that was recorded by DHANOTA and MADDOX.

251.    PLAINTIFF is informed and believes that Ms. Schardijin also mentioned the polygraph in her report, and edited it out due to the call from MADRIGAL.

252.    Ms. Schardijin was asked if this – telling her to modify reports – was something CFS does, and after a lengthy hesitation, she stated, "sometimes."

253.    Ms. Schardijin was also asked by counsel whether Jeremy would be having to take ten (10) more counseling sessions total to complete his service requirement in that regard.

254.    Ms. Schardijin informed Counsel that "CPS decides that."  She explained that CPS decides how many sessions they will pay for.

255.    When questioned on the propriety of an unlicensed social worker such as Madrigal making the decision on how many counseling sessions a person needs to meet some treatment objective, Ms. Schardijin, after first commenting, "Well, we have a contract with the 'agency/count,' said she knew what Counsel meant by the reference to the impropriety.

256.    Ms. Schardijin advised Counsel that she was recommending he deal with domestic violence issues in his regular counseling with her.

257.    MADRIGAL never informed the Court in any report, or during any testimony, that she had sought and received the modification of the therapist Ms. Schardijin's report to the court on the progress of Jeremy, which in this instance also addressed the decision as between domestic violence classes vs. counseling that also addressed the issue.

258.     Finally, MADRIGAL had attended a CFT meeting with the family on October 2nd, 2019, which Frank Westfall and his wife Melynda – who had been given placement of B.W. – were told was to "check in" on B.W. and just see how things are going and ask about any concerns.

259.     During this session, Frank voiced his opinion about how unfair this entire process was to Jeremy, to B.W. and to himself and his wife.  The entire time MADRIGAL nodded her head in agreement.

260.     MADRIGAL told the grandparents that when she got handed the case file that she had been warned by her co-workers not to go to Jeremy's home as he is angry or volatile, but that she likes to form her own opinion of people she's dealing with, and that Jeremy has never made her feel nervous or worried, or words to that effect, when in Jeremy's presence.

261.     When the meeting ended, and they all left out to the parking lot, MADRIGAL re-assured Frank that she would not remove B.W. from their home, and also said she did not care how often Jeremy visits (his visits were a mere 4 hours a week total at that time), but if Jeremy gets "found out" and she gets asked about it, she will lie and say she did not say that.

262.     Indeed, that is exactly what MADRIGAL did.

263.     During a proceeding in 2020, as part of the hearing that would eventually lead to the matter being finally dismissed over the objection of the County and the minor's attorney – a minor's attorney whose positions virtually never varied from the CFS's position in any event - MADRIGAL was called to the stand and she lied under oath, denying the foregoing completely.

264.     Frank Westfall, his wife Melynda Westfall, and Jeremy Westfall all took the stand and said the truth about what MADRIGAL had said to them regarding unlimited visits by

Jeremy being ok with her.

## IV

## DAMAGES

265.    As a result of the conduct of Defendants, PLAINTIFF suffered severe emotional distress, anxiety, and general damage to his psyche to such an extent as to cause physical manifestations of pain and symptoms of nausea and severe depression.  These related symptoms included but were not limited to sleeplessness and sleep disturbance, headaches, fatigue, malaise, irritability, an inability to focus, a generalized fear of authority figures and social workers, as well as a loss of appetite and loss of weight.  The removal and continued separation of the PLAINTIFF from his child B.W. caused humiliation and embarrassment and loss of reputation in the community to PLAINTIFF.

266.    PLAINTIFF is also informed and believes, and thereupon alleges, that he was placed on various state and local database registries for perpetrators of child abuse, further damaging his reputation and likely causing damages in the future in his rights of membership, society, community participation, and association.

267.    PLAINTIFF seeks an award of exemplary (punitive) damages under federal law and pursuant to California Civil Code §3294 to make an example of and punish the individually named non-entity defendants, and in the hope of deterring future conduct of a similar nature.

268.    The acts and omissions of the individually named Defendants complained of herein are malicious, oppressive, borne of deliberate indifference, shocking to the conscience of the reasonable person, and despicable in the extreme, and as such, entitle PLAINTIFF to an award of punitive damages.

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

# V.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

Violation of 14th Amendment Rights –Interrogation of B.W

[Plaintiff v. NGUYEN and POWELL]

270. Plaintiffs re-alleges and incorporates paragraphs 1 through 264, inclusive, as though fully set forth at this point, as they relate to a cause of action against NGUYEN and POWELL for a violation of Plaintiff's civil rights under the 14th Amendment to the United States Constitution, with regard to the warrantless interrogation of B.W. at Aspire Summit Charter School on February 25, 2019.

271. Plaintiff alleges these interrogations constituted seizures that were undertaken without consent, probable cause, a warrant, or exigent circumstances justifying the interrogations without notice, consent, or the opportunity to be present provided to Plaintiff, leaving B.W. to be questioned without the presence of his parent, in the context of an investigation, of a child as to whom there were no allegations of abuse or neglect from any source, and as such violated all Plaintiffs 14 Amendment rights of familial association.

272. Plaintiff re-alleges paragraphs 265-266 as said damages relate to a cause of action for a violation of Plaintiff's 14th Amendment rights for interference in his familial relations occasioned by the interrogations of B.W. at school on February 25, 2019.

378. The punitive damage allegations of paragraph 267-268 apply in this cause of action as against the Defendants for the violation of Plaintiff's rights as stated.

### SECOND CLAIM FOR RELIEF

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

Violation of 14th Amendment – Removal

[Plaintiff v. Nguyen, Huber, Powell, Tout, Llamas,
Anchlutz, Contreras]

273.  Plaintiff re-alleges and incorporates paragraphs 1 through 264, inclusive, as though fully set forth at this point, as they relate to a claim for relief against Nguyen, Huber, Powell, Tout, Llamas, Anchlutz, and Contreras for violations of Plaintiff's 14th Amendment rights to familial association. Such rights were violated by the removal of B.W. on February 27, 2019 from his father's custody, care, and control. While the rights of minors, as it concerns removal, arise under the 4th Amendment, parents maintain an identical right under the 14th Amendment.

274.  The removal of B.W. was undertaken without consent, probable cause, a warrant, or exigent circumstances justifying such removal from Plaintiff. Defendants failed to conduct an adequate investigation and ignored exculpatory evidence presented to them by Plaintiff and other collateral contacts.

275. Plaintiff re-alleges paragraphs 265-266 as said damages relate to a claim for relief for a violation of Plaintiff's constitutional right to familial association, violated by removal of B.W.

276. The punitive damage allegations of paragraphs 267-268 apply in this claim for relief to Defendants for the violation of Plaintiff's rights as stated.

### THIRD CLAIM FOR RELIEF
14th Amendment Violation (Procedural) – Removal

[Plaintiff v. Nguyen, Huber, Powell, Tout, Llamas,
Anchlutz, Contreras]

277. Plaintiff re-alleges and incorporates paragraphs1 through 264, inclusive, as though fully set forth at this point, as they relate to a claim for relief against Nguyen, Huber, Powell, Tout, Llamas, Anchlutz, and Contreras for violations of Plaintiff's 14th Amendment rights to

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

familial association. Such rights were violated by the removal of B.W. on February 27, 2019 from his father's custody, care, and control without adequate process.

278. This Claim for Relief is for the procedural due process violation of the Plaintiff's rights, for failing to provide Plaintiff the constitutional prerequisite notice, and opportunity to be heard, before inflicting the violation of his rights of familial association occasioned by the Child B.W.'s removal, which was undertaken without consent, probable cause, a protective custody warrant, or exigent circumstances justifying removal, as such action constituted a violation of Plaintiffs' procedural due process rights pursuant to the 14th Amendment.

279. Plaintiff re-alleges paragraphs 265-266 as said damages relate to a claim for relief for a violation of the Plaintiffs' constitutional procedural due process right to be free from unreasonable warrantless seizures constituting interference in their familial relations without fair notice and an opportunity to be heard.

280. The punitive damage allegations of paragraphs 267-268 apply in this claim for relief to Defendants for the violation of Plaintiff's rights as stated.

**FOURTH CLAIM FOR RELIEF**
14th Amendment Violation (Substantive) – Removal

[Plaintiff v. Nguyen, Huber, Powell, Tout, Llamas,
Anchlutz, Contreras]

281. Plaintiff re-alleges and incorporates paragraphs 1 through 264, inclusive, as though fully set forth at this point, as they relate to a claim for relief against Nguyen, Huber, Powell, Tout, Llamas, Anchlutz, and Contreras for violations of Plaintiff's 14th Amendment rights to familial association. Such rights were violated by the warrantless removal of B.W. on February 27, 2019 from his father's custody, care, and control.

282. This Claim for Relief is for the substantive due process violation of the Plaintiff's rights, for invading the family's rights of familial association pursuant to the 14th Amendment, the Defendants' actions constituting reckless disregard and deliberate indifference to the family members rights, safety, and welfare. This claim also includes the 14th Amendment violation associated with forcing Plaintiff into a Safety Plan against his will, using the threat of removal of his child to accomplish obtaining his signature to the Safety Plan.

283. Plaintiff re-alleges paragraphs 265-266 as said damages relate to a claim for relief for a violation of the Plaintiff's constitutional substantive due process right to be free from unreasonable warrantless seizures invading his fundamental liberty interests in the love, care, and companionship of B.W.

284. The punitive damage allegations of paragraphs 267-268 apply in this claim for relief to Defendants for the violation of Plaintiff's rights as stated.

## FIFTH CLAIM FOR RELIEF

14th Amendment Violation (Substantive) – Continuing Detention - Fraud

[Plaintiff v. Nguyen, Huber, Wilbur, Maddox, Pannell,
Bartlett, Madrigal, Dhanota]

285. Plaintiff re-alleges and incorporates paragraphs 1 through 264, inclusive, as though fully set forth at this point, as they relate to a claim for relief against Nguyen, Llamas, Maddox, Madrigal, Wilbur, Pannell, and Anchlutz for a violation of Plaintiff's familial association rights under the 14th Amendment to the United States Constitution, with regard to the continued separation of the Plaintiff family members after the initial warrantless removal of B.W. from the care, custody, and control of Plaintiff on February 27, 2019, accomplished

through the use of fraud, misrepresentation, and omission of material facts and evidence in the Petition filed under oath to commence the juvenile matter, and the reports written thereafter.

286. The juvenile court relied on the false statements and misrepresentation of facts, and the numerous omitted material facts in the Petition filed with the Court, and in the reports written and submitted to juvenile court thereafter.

287. The falsehoods, misrepresentations, and omissions when included/excluded in a juvenile dependency Petition sworn under oath, were known to the social workers to be deemed "true" by the juvenile dependency court for purposes of considering removal of a child[ren] at a detention hearing under California law.

288. The social worker Defendants were also aware that the only next opportunity to contest the falsehoods and omissions would be at least one month after the original detention hearing (first hearing after removal of children) and at the jurisdiction hearing.

289. This Claim for Relief is for the substantive due process violation of the Plaintiff's rights, for invading the family's rights of familial association pursuant to the 14th Amendment, the Defendants' actions constituting reckless disregard and deliberate indifference to the family members rights, safety, and welfare, accomplishing the continued separation of the family members through the use of fraud, misrepresentations and omissions of material facts in juvenile dependency proceedings.

290. Plaintiff alleges this Claim For Relief includes in its ambit the two separate but related contentions of Plaintiff, which are,

• The use of fraudulent statements and misrepresentations, and omissions of exculpatory evidence and information in the juvenile proceeding at all, constitutes a

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

claim for a 14th Amendment substantive due process violation of the Plaintiff's rights of familial association, separate and apart from any other Claim for Relief,

• The use of fraudulent statements and misrepresentations, and omissions of exculpatory evidence and information in the juvenile proceeding to accomplish and/or continue the separation of B.W. and his father, Plaintiff, is in and of itself an additional and separate claim constituting a separately cognizable 14th Amendment substantive due process violation.

291.   Plaintiff re-alleges paragraphs 265-266 as said damages relate to a claim for relief for a violation of the Plaintiff's constitutional substantive due process right to be free from a continuing violation of their fundamental liberty interests in the love, care, and companionship of each other, their familial relations rights.

292.   The punitive damage allegations of paragraphs 267-268 apply in this claim for relief to Defendants for the violation of Plaintiff's rights as stated.

## SIXTH CLAIM FOR RELIEF

*Monell* Liability

[Plaintiff v. County]

293.   Plaintiff re-alleges each and every paragraph in this complaint as if fully set forth herein.

294.   The unconstitutional actions/omissions of Defendants Nguyen, Huber, Tout, Llamas, Anshutz, Contreras, Wilbur, Dhanota, Maddox, and Pannell resulted from the customs, practices, and/or procedures alleged in paragraphs 39 through 44, and elaborated at points

thereafter herein above, which actions and failures to act were directed, encouraged, allowed, and/or ratified by policymaking officers for Defendant Stanislaus County.

295.  Defendant County failed to properly train, instruct, monitor, supervise, and discipline Defendants Nguyen, Huber, Tout, Llamas, Anshutz, Contreras, Wilbur, Dhanota, Maddox, Madrigal, and Pannell, evidencing deliberate indifference to Plaintiff's constitutional rights and other citizens of Stanislaus County, which rights were thereby violated as described above.

296.  The unconstitutional actions and/or omissions of Defendants were known, and were ordered, approved, tolerated and/or ratified by policy making officers for Defendant County.

297.  The aforementioned customs, policies, practices, and procedures, as well as the failures to properly and adequately train, instruct, monitor, supervise and discipline of Defendants County were a moving force and/or a proximate cause of the deprivations of Plaintiff's clearly-established and well-settled constitutional rights in violation of 42 USC § 1983, as more fully set forth above.

298.  As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices and procedures of Defendant County, as described above, Plaintiff sustained serious and permanent injuries and is entitled to damages, penalties, costs and attorneys' fees as set forth in paragraphs 265-266, above.

**PRAYER FOR RELIEF,**

WHEREFORE, PLAINTIFF respectfully request that this Court:

1.)     Award PLAINTIFF general, special and compensatory damages in an amount to be proven at trial;

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

2.)    Award PLAINTIFF punitive damages against individually named Defendants, and each of them, for their extreme and outrageous conduct in complete disregard for the rights of the PLAINTIFF;

3.) Award PLAINTIFF statutory damages and/or attorney's fees against all Defendants as allowed by 42 U.S.C. §1988 and C.C.P. §1021.5;

DATED:  February 27, 2021                    _/s/Robert R. Powell_____
                                             ROBERT R. POWELL, ESQ.
                                             Attorney for PLAINTIFFS

Complaint
Westfall, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.